**ASHLEY MR. MCKENZIE SMITH**
Pro Se for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## MEMPHIS DIVISION

| | |
|---|---|
| **ASHLEY MR. MCKENZIE SMITH**[1], as Personal Representative of the Estate of Jaylin Mr. McKenzie; and **ASHLEY MR. MCKENZIE SMITH** in her individual capacity. | NO. |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| **The City of Memphis,** a municipal corporation; Chief Cerelyn Davis, in her official capacity; Chief Cerelyn Davis, in her individual capacity; Nahum Dorme, in his individual capacity; Ericsteven Cook, in his individual capacity; Joseph Mallet, in his individual capacity; Christopher Jackson, in his individual capacity, Mark Gilbertson, in his individual capacity and as an agent of the City of Memphis. | **JURY DEMAND** |
| Defendants. | |

## PRELIMINARY STATEMENT

---

[1] Ashley LaToya McKenzie Smith, Estate of Jaylin KeShawn Emmett McKenzie, Deceased- File Number PC-2023-003311, pending as of November 22, 2023

COMPLAINT
PAGE 1 OF 37

1.    On December 16, 2022, Mr. Jaylin Mr. McKenzie ("Mr. McKenzie") was shot 5 times by a Memphis Police Department officer.

2.    Though he was shot 5 times by the Memphis Police Department's Officers, Mr. McKenzie did not immediately die. He lay near the officers, seen and hear still breathing, and moaning for help, The moans were ignored by officers who were trained to render him medical aid.

3.    This is a civil action for monetary relief against the City of Memphis, Memphis Police Department Officers' Nahum Dorme, Ericsteven Cook, Joseph Mallet, Christopher Jackson, and others, for violating Jaylin Mr. McKenzie's civil rights by subjecting him to unreasonable and excessive force by shooting him multiple times and then leaving him to die ignored his suffering and rejected his humanity.

4.    This action also seeks monetary relief against the same defendants for unlawfully depriving Jaylin Mr. McKenzie's mother, Ashley Mr. McKenzie Smith, of the society and companionship of her son.

## JURISDICTION AND VENUE

5.    This Court has original jurisdiction over the plaintiffs' civil rights claims under 42 U.S.C. § 1983, pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343. This Court has supplemental jurisdiction over the plaintiffs' related state claims pursuant to 28 U.S.C. § 1367(a).

COMPLAINT
PAGE 2 OF 37

6.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because all of the events that support the plaintiffs' allegations occurred in this judicial district and because the defendants reside in this judicial district.

**PARTIES**

7.     At all relevant times and until the time of his death on December 16, 2022, Plaintiff's decedent, Jaylin Mr. McKenzie, was a citizen of the United States and the City of Atlanta in the State of Georgia.

8.     Plaintiff Ashley Mr. McKenzie Smith, in her representative capacity, is the duly appointed Personal Representative of the Estate of Jaylin Mr. McKenzie filed under the laws of the State of Georgia[2].

9.     Plaintiff Ashley Mr. McKenzie Smith, in her individual capacity, is the mother of Jaylin Mr. McKenzie (deceased) and is a citizen of the United States and the City of Atlanta, in the State of Georgia.

10.     The City of Memphis is and was at relevant times a political subdivision of the State of Tennessee, organized and existing under and by virtue of the laws and the Constitution of the State of Tennessee.

11.     Under Article XI, Section 9 of the Constitution of the State of Tennessee, the state law of Tennessee is a city's creation of a charter.

---

[2] Ashley LaToya McKenzie Smith, Estate of Jaylin KeShawn Emmett McKenzie, Deceased- File Number PC-2023-003311, pending as of November 22, 2023

COMPLAINT
PAGE 3 OF 37

12. The City of Memphis fulfills its policing functions through the Memphis Police Department, which is and was at all relevant times a law enforcement agency.

13. The Memphis Police Department is led by the Director of Police Services, also known as the "Chief of Police," who is bestowed with the following authority under the City of Memphis Charter's Section on Police Services:

a. The director of police services shall have general care of the peace of the city, and shall see that all subordinates do their duty in preserving the same. Title 2, Chapter 2-30, Sec. 28-3.

b. He or she shall have control over the entire police force and see to the execution of every ordinance. Title 2, Chapter 2-30, Sec. 28-3.

c. He or she shall have a general supervision over the subject of nuisances, and the abatement of the same, and shall exercise and discharge all such powers and functions as pertain to his or her office and perform such other duties as may be required of him or her by this Code or other ordinance. Title 2, Chapter 2-30, Sec. 28-3.

d. The director of police services is authorized and empowered to appoint one deputy director, four deputy chiefs and as many chief inspectors, inspectors, captains, lieutenants, sergeants, detectives, and patrol officers, together with such emergency police, secretaries, clerks, stenographers, operators, janitors, turnkeys, desk lieutenants, desk sergeants, mechanics, matrons, women police officers and such other to

COMPLAINT
PAGE 4 OF 37

help as may be needed to efficiently police the city and to efficiently conduct the police division of the city. Title 2, Chapter 2-30, Sec. 28-4.

e. The director of police, may, from time to time, promulgate and shall enforce such rules and regulations for the conduct of the police division, not inconsistent with the Charter and ordinances of the city, as may be necessary for the efficient conduct of the division and policing of the city. Title 2, Chapter 2-30, Sec. 2-28-7.

14. The Director of Police Services, also known as the Chief of Police of the Memphis Police Department, is and was at all relevant times the final policymaker as it relates to the implementation of police policies and practices.

15. The Director of Police Services, also known as the Chief of Police of the Memphis Police Department, is and was at all relevant times the final policymaker as it relates to the implementation of police hiring and assignments within the Memphis Police Department.

16. The Director of Police Services, also known as the Chief of Police of the Memphis Police Department, is and was at all relevant times the final policymaker as it relates to the implementation and oversight of police training.

17. The Director of Police Services, also known as the Chief of Police of the Memphis Police Department, is and was at all relevant times

COMPLAINT
PAGE 5 OF 37

18. In April 2021, the City of Memphis appointed Cerelyn Davis ("Chief Cerelyn Davis") as the Director of Police Services, also known as the Chief of Police of the Memphis Police Department.

19. Upon information and belief, Chief Cerelyn Davis is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

20. At all relevant times, Chief Cerelyn Davis was employed by the City of Memphis as the duly appointed Chief of Police and Director of Police Services, was acting in her official capacity under color of state law, and was acting within the scope of her employment with the City of Memphis.

21. Upon information and belief, Defendant Nahum Dorme is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

22. At all times relevant hereto, Defendant Nahum Dorme was a police officer with the Memphis Police Department, and was acting within the course and scope of his employment. All acts committed by Defendant Nahum Dorme were done under color of the laws of the State of Tennessee and under the authority of his position as a police officer with the Memphis Police Department.

23. Defendant Christopher Jackson is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

24. At all times relevant hereto, Defendant Christopher Jackson was a police officer with the Memphis Police Department, and was acting within the course and scope of his

COMPLAINT
PAGE 6 OF 37

employment. All acts committed by Defendant Christopher Jackson were done under color of the laws of the State of Tennessee and under the authority of his position as a police officer with the Memphis Police Department.

25. Defendant Ericsteven Cook is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis.

26. At all times relevant hereto, Defendant Cook was a police officer with the Memphis Police Department, and was acting within the course and scope of his employment. All acts committed by Defendant Cook were done under color of the laws of the State of Tennessee and under the authority of his position as a police officer with the Memphis Police Department.

27. Defendant Joseph Mallet is and was at all relevant times a citizen of the United States, the State of Tennessee, and the City of Memphis. At all times relevant hereto, Defendant Mallet was a police officer with the Memphis Police Department, and was acting within the course and scope of his employment. All acts committed by Defendant Mallet were done under color of the laws of the State of Tennessee and under the authority of his position as a police officer with the Memphis Police Department.

## FACTUAL ALLEGATIONS

*Defendants engage in unauthorized high speed vehicular pursuit, unauthorized foot pursuit, and then shot 9 rounds at Mr. McKenzie as he runs away, mortally wounding him.*

COMPLAINT
PAGE 7 OF 37

28.    At approximately 11:49 PM on the evening of December 16, 2022, Jaylin Mr. McKenzie was the passenger in a 2008 white Infiniti in Memphis, Tennessee. Mr. McKenzie was not the driver of the white Infiniti.

29.    Mr. McKenzie's was not a resident of Tennessee. Mr. McKenzie resides in Atlanta, Georgia with his mother, Ashley Mr. McKenzie Smith. At the time of Mr. McKenzie's demise, he was visiting his paternal side of his family from out-of-state.

30.    The white Infiniti's front and rear lights were on. The vehicle was operating at the speed limit.

31.    At 11:50:23 PM the Shelby County District Attorney alleges the white Infiniti runs a red light near Clearbrook and American Way.

32.    At 11:50:32 PM Christopher Jackson ("Christopher Jackson") turns on his body worn camera (BWC). Christopher Jackson is in the passenger seat of the police vehicle.

33.    Christopher Jackson tells his partner, MPD Officer Nahum Dorme ("Nahum Dorme") to "keep going" and "push it." Nahum Dorme can be heard revving the engine of the police vehicle. Nahum Dorme did not initiate any police vehicle lights or siren.

34.    At 11:50:56 PM Nahum Dorme says the police siren is not working.

35.    At 11:50:59 PM Christopher Jackson says they need to "figure out what's wrong with this motherfucking siren" and instructs Nahum Dorme to "keep pushing it."

36.    Nahum Dorme can be heard revving the engine and accelerating the police vehicle. Nahum Dorme and Christopher Jackson engage in an unauthorized high-speed pursuit

COMPLAINT
PAGE 8 OF 37

of the white Infiniti. Nahum Dorme and Christopher Jackson show no signs to the white Infiniti that they are attempting to conduct a traffic stop.

37. At 11:51:23 PM, over two minutes after pursuing the white Infiniti, Nahum Dorme initiates the police vehicle lights. Christopher Jackson encourages Nahum Dorme to "keep going, keep going, keep going."

38. At 11:51:49 PM, seconds after signaling to the white Infiniti they were initiating a traffic stop, Nahum Dorme parks the vehicle. Christopher Jackson says, "Oooo, there he go. He goin' try to run. Now, stop, stop. He fucked."

39. Upon exiting the vehicle, Nahum Dorme can be heard yelling "Show me your hands."

40. Christopher Jackson exits the police vehicle and yells "Get on the motherfucking ground." and can be heard yelling at Mr. McKenzie "Do you want to get shot, Do you want to get shot and a pow is heard a second later.

41. Christopher Jackson and Nahum Dorme begin to chase Mr. Jaylin Mr. McKenzie on foot.

42. At 11:51:54 PM, seconds after exiting the white Infiniti, Mr. McKenzie slipped and fell on the ground. Mr. McKenzie's back is towards Nahum Dorme and Christopher Jackson. Christopher Jackson is pointing a firearm at Mr. McKenzie.

43. At 11:51:56 PM Mr. McKenzie gets off the ground and began running away from the direction of Nahum Dorme and Christopher Jackson.

COMPLAINT
PAGE 9 OF 37

44. After approximately 40 seconds of chasing Mr. McKenzie on foot, Christopher Jackson falls to the ground.

45. At 11:52:30 PM Nahum Dorme is first seen on Christopher Jackson's BWC engaging in a foot pursuit of Mr. McKenzie. Christopher Jackson begins to slow his foot pursuit.

46. At 11:52:42 PM Christopher Jackson yells for Nahum Dorme to "get him" multiple times to Mr. McKenzie.

47. From 11:52:47 PM to 11:52:52 PM Nahum Dorme fired nine shots at Mr. McKenzie while Mr. McKenzie was running away.

*Memphis Police Department officers fail to render aid to Mr. McKenzie who is moaning for help and heard still breathing on Christopher Jackson's Body Worn Camera.*

48. Following Nahum Dorme's report of the shooting, Nahum Dorme and Christopher Jackson continued to surveil the scene. Nahum Dorme asks Christopher Jackson if he is okay.

49. Mr. McKenzie can be heard breathing, moaning and moving his arms. His hands are behind his head.

50. Nahum Dorme repeats "shots fired" over the radio and says, "He's down."

51. At 11:53:22 PM Christopher Jackson stands above Mr. McKenzie with his firearm drawn and pointed towards Mr. McKenzie.

COMPLAINT
PAGE 10 OF 37

52.    By 11:53:57 PM, at least four MPD officers were at the scene of the shooting. A woman is heard screaming. Officer Ericsteven Cook ("Cook") is heard saying "fuck" and "fuck me."

53.    No one renders aid or any life-saving efforts to Mr. McKenzie.

54.    Mr. McKenzie is pronounced dead at 12:11 AM by paramedics.

> *The City of Memphis' Decision to Hire Cerelyn Davis as the Police Chief Despite Awareness of her Controversial Past in Units Involving Questionable Police Practices.*

55.    Chief Cerelyn Davis joined the Memphis Police Department in 2021 after tenures with the Atlanta Police Department, among other departments around the country.

56.    Chief Cerelyn Davis' history with the Atlanta Police Department and her creation of RED DOG (Run Every Drug Dealer Out of Georgia) Unit should have been a red flag for the City of Memphis prior to hiring Davis as Chief.

57.    The RED DOG Unit was comprised of over 30 officers working on larger teams of 4 to 7 officers whose mission was to engulf high crime areas.

58.    The RED DOG Unit became unfamous for their practices of "jumping out" to ambush Atlanta citizens and aggressively harass them and strip search them in public.

59.    Functioning like a gang, the RED DOG Unit would regularly present false information to obtain warrants and cut corners to make more time for lucrative side jobs providing additional security to businesses, often while on duty, and receiving cash payments.

60.    In 2006, just months into Chief Cerelyn Davis' time as a Commander in the Red Dog Unit, three narcotics officers shot and killed a 92-year-old woman in a drug raid gone wrong.

61.    According to prosecutors of those narcotics officers, their "routine violations of the Fourth Amendment led to the death of an innocent citizen."

62.    The incident caused an overhaul of the RED DOG Unit after the light was shed on the pattern and practice of officers lying to obtain search warrants in violation of the Fourth Amendment and other misdeeds.

63.    RED DOG officers' testimony established that they were encouraged by supervisors to engage in searches and seizures when there was no basis to do so in violation of the Fourth Amendment.

64.    RED DOG officer testimony established that officers were encouraged by supervisors to omit written reports if they engaged in searches but found no drugs or weapons to maintain a stronger "hit: rate on their stops.

65.    RED DOG officers were "told to get the job done, by whatever means" necessary.

66.    The final straw came in 2009 when a RED DOG Unit stormed into a popular LGBTQ bar wearing black fatigues shouting profanity and homophobic slurs while throwing patrons to the ground and handcuffing without any probable cause.

67.    The 2009 incident eventually led to a federal civil rights lawsuit under § 1983, which led to the disbanding of the RED DOG Unit in 2011.

COMPLAINT
PAGE 12 OF 37

68.    Numerous other lawsuits were also filed accusing members of the RED DOG Unit of hyper-aggressive, violent police tactics violating Atlanta citizen's constitutional rights, specifically those under the Fourth Amendment.

*The City of Memphis' Decision allowed Chief Cerelyn Davis to Continue the Problematic Practice of Institutionalized Police Oppression Units.*

69.    Over a decade after the RED DOG Unit federal civil rights lawsuits in Atlanta, Chief Cerelyn Davis was installed as the Police Chief of Memphis Police Department, also known as the Chief of Police Services, in April 2021.

70.    Chief Cerelyn Davis was the first Black female to serve as the Chief of the Memphis Police Department.

71.    Chief Cerelyn Davis was also under immense pressure coming into the Memphis Police Department as an outsider never having worked in the City of Memphis before.

72.    Chief Cerelyn Davis was hired amidst a rising homicide rate in the City of Memphis and the departure of many veteran officers due to the changing compensation structures within the Memphis Police Department.

73.    Chief Cerelyn Davis knew that she would be under massive scrutiny in taking on this new role and knew that she had to act decisively.

74.    Less than a year after her appointment, Chief Cerelyn Davis resorted to their Atlanta roots and a familiar concept to gain approval: police suppression units.

COMPLAINT
PAGE 13 OF 37

75.     Memphis Police Department formed the SCORPION Unit (Street Crimes Operation to Restore Peace In Our Neighborhoods) in November 2021.

76.     The SCORPION Unit was established as a special anti-crime policing unit under the Organized Crime Unit umbrella of the Memphis Police Department, with officers hired and assigned by Chief of Police to patrol higher crime neighborhoods.

77.     Much like the RED DOG Unit, the SCORPION Unit was comprised of four revolving teams, with about ten officers per team, operating seven days a week targeting different areas of the city with the goal of addressing violent crime and homicides.

78.     Much like the RED DOG Unit, the SCORPION Unit used unmarked police vehicles, wore tactical clothing, and employed an aggressive "street-style" of policing that was feared toward intimidation and force, rather than policing consistent with the Constitution.

79.     The SCORPION Unit utilized the theory of patrolling purported "hot spot" crime areas with "crime suppression" officers, while others focused on auto thefts and gangs.

80.     Chief Cerelyn Davis instructed SCORPOIN officers to focus on an all-out strategy of seizing property from Memphis citizens in complete disregard to the United States Constitution and the Fourth Amendment.

81.     Much like the RED DOG Unit's mandate to stop crime at any cost, Chief Cerelyn Davis instructed the SCORPION Unit and advocated to stop citizens and deprive them of their property unconstitutionally: "Tale the car…Even if the case gets dropped in court."

82.     Such instruction from Chief Cerelyn Davis not only condones the actions of the SCORPION Unit officers with Memphis Police Department, but also imparts a broader training

to all Memphis Police Officers, instructing them to seize property from Memphis citizens without due process.

83.    Such instruction from Chief Cerelyn Davis not only condones the actions of the SCORPION Unit officers, but also imparts a broader training to all Memphis Police Officers to disregard the constitutional rights of Memphis citizens.

84.    Such instruction from Chief Cerelyn Davis not only condones the actions of the SCORPION Unit officers, but also imparts a broader training to all Memphis Police Officers to explicitly disregard the Constitution and, more specifically, the provisions of the Fourth Amendment.

85.    Much like the RED DOG Unit practices, the SCORPION Unit and Memphis Police Officers engaged in a practice of "jumping out" to ambush Memphis citizens and aggressively harass them and search them in public.

86.    Much like the RED DOG Unit practices, the SCORPION Unit and Memphis Police Officers were encouraged by the Chief of Police and supervisors to engage in searches and seizures when there was no basis to do so in violation of the Fourth Amendment.

87.    Much like the RED DOG Unit practices, the SCORPION Unit and Memphis Police Officers were encouraged by the Chief of Police and supervisors to omit written reports if they engaged in searches but found no drugs or weapons to maintain a stronger "hit" rate on their stops.

COMPLAINT
PAGE 15 OF 37

88.    In addition to the SCORPION Unit, Memphis Police Department initiated a "Infiniti War Take-Over Operation" in June 2022. Mr. McKenzie was a passenger in a white Infiniti.

*The City of Memphis' Staffing of Memphis Police Department and their Broader Indifference to Hiring Standards and Training Within the Memphis Police Department*

89.    Chief Cerelyn Davis, as Director of Police Services, was specifically tasked with the hiring of police officers and was the final policymaker for the City of Memphis in this capacity.

90.    With a mission statement of "stopping crime at any cost," the City of Memphis had a constitutional duty to ensure that the officers it was hiring were qualified and capable of carrying out their duty without violating the Constitution.

91.    But rather than being elite, accomplished officers, Memphis Police Department officers were often officers with past disciplinary issues or were vastly inexperienced.

92.    For instance, Nahum Dorme had been employed by Memphis Police Department for less than one year at the time he killed Mr. McKenzie.

93.    Chief Cerelyn Davis and the City of Memphis were hiring inexperienced and problem officers throughout the department between 2020 and 2022, after significantly decreasing hiring standards and an exodus of veteran leadership.

COMPLAINT
PAGE 16 OF 37

94.    Still experiencing a lack of interest, the City attempted to entice more recruits in 2021 by offering a $15,000 signing bonus. Nahum Dorme was hired on December 20th, 2021.

95.    A year later in 2022, the City reduced the fitness test standards to secure more "qualified" officers.

96.    The City of Memphis also increasingly utilized arrest waivers for officers applying to the Memphis Police Department, which permitted more officers with a prior criminal arrest record to be selected as Memphis Police Department officers.

97.    The police academy, which ultimately fed these recruits to the Memphis Police Department, also relaxed standards by utilizing a more lenient grading structure and allowing recruits to retake exams several times.[3]

98.    Failures that would have resulted in a dismissal were now tolerated at the academy, and cheating with previews of test materials was encouraged.

99.    If a student could not grasp the material or perform skills test- such as utilizing their service weapon- they were given multiple opportunities until they "passed" the already lower minimum standards.

100.    Even failures in shooting exams were now tolerated, as students unable to properly utilize their firearm graduated the academy and applied for positions within the Memphis Police Department.

101.    These changes in protocol were not communicated in writing, but rather through word of mouth.

---

[3] https://www.washingtonpost.com/national-security/2023/03/12/memphis-police-academy-tyre-nichols/

COMPLAINT
PAGE 17 OF 37

102.    The graduating Police Academy classes were larger, because with lower standards, there were necessarily more graduates, albeit unqualified.

103.    Recent graduates often lacked communication skills and the ability to recognize when a situation should be de-escalated.

104.    Formal excessive-force complaints against Memphis Police Department officers reached an all- time high in 2020; nearly a 60% from the previous three years' average.[4]

105.    At least one officer involved in Mr. McKenzie's death graduated from the police academy during this problematic period of decreased oversight and requirements.

106.    Furthermore, the City of Memphis and Chief Cerelyn Davis were aware of the decreased standards and subpar graduates at the Police Academy.

107.    The City of Memphis and Chief Cerelyn Davis failed to promulgate any specified policies or training to any member of the Memphis Police Department:

    a.  *Terry* stops;

    b.  Reasonable articulable suspicion;

    c.  Probable cause;

    d.  Traffic stops;

    e.  Foot pursuits;

    f.  The Fourth Amendment;

    g.  The use of batons;

    h.  The use of tasers;

---

[4] Inspectional Services 2021 Annual Report, Inspectional Services 2022 Annual Report

COMPLAINT
PAGE 18 OF 37

i.   The use of pepper spray; and

j.   The use of deadly force.

108.   The individual defendant-officers were not adequately trained in the constitutional limitations on the use of force.  Throughout their encounter with Mr. McKenzie, the individual defendant-officers acted intentionally, knowingly, maliciously, and recklessly in violation of Mr. McKenzie's well-established constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution.

109.   None of the individual defendant-officers involved were disciplined in any serious manner by the Memphis Police Department. The unlawful use of excessive force by the individual defendant-officers was carried out in accordance with the policies and procedures of the Memphis Police Department's  and the official policies, customs, and practices of Chief Cerelyn Davis.

*The Memphis Police Department Units Employs Controversial Techniques in the Memphis Community, as Directed by their Chief of Police.*

110.   Consistent with Chief Cerelyn Davis' unconstitutional directive, Memphis Police Units Officers engaged in pretextual traffic stops to attempt to find illegal drugs and guns by employing aggressive police tactics to achieve quotas at the cost of constitutional rights of Memphis citizens.

111.   Memphis Police Units were known for utilizing extreme intimidation, humiliation, and violence in their "investigations."

COMPLAINT
PAGE 19 OF 37

112.    The individual defendant-officers unmistakably replicated the techniques Chief Cerelyn Davis implemented in the SCORPION Unit and Memphis Police Department trainings. Defendant-officers utilized a course of conduct endorsed and recommended by their Chief of Police: they would start their hostile and harassing encounters with a traffic stop, sometimes for something minor like a seatbelt or tinted window infraction.

113.    Next, they would jump out of their unmarked squad vehicles while barking commands. Those in the stopped vehicle were left confused, concerned, and frightened.

114.    In this instance, an unfounded traffic stop occurred which was initiated by an unidentified Memphis Police vehicle. Memphis Police officers suddenly jumped out of their vehicle and ambushed the passenger of the vehicle (Mr. McKenzie) who had not committed the suspected traffic violation. Memphis Police officers yell profanities and point their firearms at Mr. McKenzie to scare him. Memphis Police officers never identify who they are or that they are law enforcement. Mr. McKenzie is scared, and he runs for his life. At this moment:

    a.    Mr. McKenzie had not committed any violent crimes;

    b.    Mr. McKenzie had not committed any crimes whatsoever;

    c.    Mr. McKenzie was not a threat to any member of the public;

    d.    Mr. McKenzie was not a threat to any law enforcement officers; and

    e.    Mr. McKenzie was not a threat to any individual.

115.    Mr. McKenzie is then chased by armed police on foot, which ultimately leads to his death.

COMPLAINT
PAGE 20 OF 37

116.    The use of force used on Mr. McKenzie was excessive and unreasonable and included the unlawful use of deadly force, which proximately caused Mr. McKenzie to experience severe pain and suffering and proximately caused his death.

117.    The unlawful use of force also caused Plaintiff Ashley Mr. McKenzie Smith to be deprived of her constitutional right to society and companionship of her son.

## CLAIMS AGAINST THE CITY OF MEMPHIS & MEMPHIS POLICE DEPARTMENT

## CAUSES OF ACTION

### COUNT 1— 42 U.S.C. § 1983—*Monell Claim*—Official Policy

*Plaintiff v. Chief Cerelyn Davis, in her official capacity (City of Memphis)*

118.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 117 as though fully pleaded herein.

119.    The Director of Police Services, also known as the Police Chief of the Memphis Police Department (hereinafter "Chief"), is the official with policymaking authority for the City of Memphis regarding policing and police policies and practices.

120.    Cerelyn Davis ("Chief Cerelyn Davis") was installed as the Police Chief of the Memphis Police Department in April 2021.

121.    In her official capacity, Chief Cerelyn Davis' actions and inactions are those of the City of Memphis.

COMPLAINT
PAGE 21 OF 37

122.    Shortly after her appointment in November 2021, Chief Cerelyn Davis created and established the Street Crimes Operation to Restore Peace In Our Neighborhoods, referred to as the "SCORPION Unit" amongst Memphis Police Departments.

123.    Seven months after her appointment, Chief Cerelyn Davis created and established the "Infiniti War Car Take-Over Operation."

124.    Chief Cerelyn Davis trained Memphis Police Officers to focus on an all-out strategy of searching and seizing individuals and their property through traffic stops in complete disregard of the United States Constitution and the Fourth Amendment.

125.    Chief Cerelyn Davis knowingly encouraged and authorized members of the Memphis Police Department to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens to attempt to "stop crime" at any cost, including condoning the use of unlawful searches and seizures.

126.    Chief Cerelyn Davis knowingly encouraged and authorized members of the Memphis Police Department to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens to attempt to "stop crime" at any cost, including condoning the use of excessive force.

127.    Chief Cerelyn Davis' authorization to Memphis Police officers to disregard and violate the Constitutional and Fourth Amendment rights on Memphis citizens constituted an official policy of the City of Memphis.

128.    Chief Cerelyn Davis' authorization to Memphis Police officers to disregard and violate the Constitutional and Fourth Amendment rights on Memphis citizens was maintained

COMPLAINT
PAGE 22 OF 37

with deliberate indifference to and at the expense of the constitutional rights of Memphis citizens.

129. Chief Cerelyn Davis' authorization to Memphis Police officers to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens was the moving force behind:

a. The unlawful and unconstitutional stop made by Defendant Officers against Mr. McKenzie;

b. The excessive, unconstitutional, and deadly force used by Defendant Officers against Mr. McKenzie;

c. The failure of Defendant Officers to intervene in the excessive force, unconstitutional, and deadly forced used by Officer Nahum Dorme against Mr. McKenzie;

d. The harms inflicted against and injuries suffered by Mr. McKenzie;

e. The constitutional violations complained of in this Complaint.

130. Mr. McKenzie's injuries and death were a direct, foreseeable, and proximate result of Chief Cerelyn Davis' authorization for Memphis Police Department officers to disregard the Constitutional and Fourth Amendment rights of Memphis citizens.

131. The violation of Mr. McKenzie's constitutional right to be free from unreasonable searches and seizures as well as excessive force were a direct, foreseeable, and proximate result of Chief Cerelyn Davis' authorization for Memphis Police Department officers to disregard the Constitutional and Fourth Amendment rights of Memphis citizens.

COMPLAINT
PAGE 23 OF 37

132.   As a direct and proximate result of Chief Cerelyn Davis' authorization for Memphis Police Department officers to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens, Mr. McKenzie suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

133.   As a direct and proximate result of Chief Cerelyn Davis' authorization for Memphis Police Department officers to disregard and violate the Constitutional and Fourth Amendment rights of Memphis citizens, Mr. McKenzie suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

134.   As a direct and proximate result of the acts described in this Count, Mr. McKenzie's next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by the jury.

135.   Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT 2— 42 U.S.C. § 1983—*Monell Claim*—Custom of Tolerance

*Plaintiff v. Chief Cerelyn Davis, in her official capacity (City of Memphis)*

136.   Plaintiff hereby incorporates and realleges Paragraphs 1 through 117 as though fully pleaded herein.

137.   The Director of Police Services, also known as the Police Chief of the Memphis Police Department (hereinafter "Chief"), is the official with policymaking authority for the City of Memphis regarding policing and police policies and practices.

COMPLAINT
PAGE 24 OF 37

138. In her official capacity, Chief Cerelyn Davis' actions and inactions are those of the City of Memphis.

139. The City of Memphis, through the Memphis Police Department, maintained a custom of tolerance for Memphis Police Department officers' unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment prior to the violation of Mr. McKenzie's death.

140. The City of Memphis' custom tolerance for Memphis Police Department officer's unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment was so permanent, well-settled, widespread, and commonly accepted within the Memphis Police Department as to constitute and carry with it the force of law.

141. The City of Memphis was consciously aware and on notice that their custom of tolerance for the Memphis Police Department officers unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment was unconstitutional and would lead to the violation of the Fourth Amendment by officers'.

142. Despite this awareness and knowledge, the City of Memphis maintained this custom of tolerance for Memphis Police Department officers' unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment with deliberate indifference to and at the expense of the constitutional rights of Memphis citizens.

COMPLAINT
PAGE 25 OF 37

143. The City of Memphis' custom tolerance for Memphis Police officers unreasonable search and seizure of individuals, and the violation of the Fourth Amendment was the moving force behind:

   a. The unlawful and unconstitutional stop made by Defendant Officers against Mr. McKenzie;

   b. The excessive, unconstitutional, and deadly force used by Defendant Officers against Mr. McKenzie;

   c. The failure of Defendant Officers to intervene in the excessive force, unconstitutional, and deadly forced used by Officer Nahum Dorme against Mr. McKenzie;

   d. The harms inflicted against and injuries suffered by Mr. McKenzie;

   e. The constitutional violations complained of in this Complaint.

144. Mr. McKenzie's injuries and death were a direct, foreseeable, and proximate result of the City of Memphis' custom tolerance for Memphis Police Department officers' unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment.

145. The violation against Mr. McKenzie's constitutional rights was a direct, foreseeable, and proximate result of the City of Memphis' custom tolerance for Memphis Police Department officers' unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment.

COMPLAINT
PAGE 26 OF 37

146. As a direct and proximate result of the City of Memphis' custom of tolerance for Memphis Police Department's unreasonable search and seizure of individuals, use of excessive force, and the violation of the Fourth Amendment, Mr. McKenzie suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

147. As a direct and proximate result of the acts described in this Count, Mr. McKenzie's next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by the jury.

148. Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT 3— 42 U.S.C. § 1983—*Monell Claim*—Failure to Train

*Plaintiff v. Chief Cerelyn Davis, in her official capacity (City of Memphis)*

149. Plaintiff hereby incorporates and realleges Paragraphs 1 through 117 as though fully pleaded herein.

150. The Director of Police Services, also known as the Police Chief of the Memphis Police Department (hereinafter "Chief"), is the official with policymaking authority for the City of Memphis regarding policing and police policies and practices related to training.

151. In her official capacity, Chief Cerelyn Davis' actions and inactions are those of the City of Memphis.

152. The City of Memphis, through the Memphis Police Department and its Chief, had a duty to train its police officers on the constitutional bounds of their police duties.

COMPLAINT
PAGE 27 OF 37

153. Specifically, the City of Memphis had a duty to train members of the Memphis Police Department to handle stops, seizures, violent crime, and vehicular crime on the constitutional bounds of their job.

154. The City of Memphis had a duty to train members of the Memphis Police Department to handle stops, seizures, violent crime, and vehicular crime on the predictable and foreseeable situations they would encounter that would implicate the Constitutional rights of citizens in Memphis.

155. The City of Memphis was aware that it had placed inexperienced officers on the Memphis Police Department with the retirement and departure of older members of the force.

156. The City of Memphis was aware that it did not have enough senior staff members training the new officers.

157. The City of Memphis was aware that rookie and otherwise inexperienced officers were placed in the field carrying out operations where they had no business serving and were bound to violate the constitutional rights of Memphis citizens without proper training and guidance.

158. The City of Memphis had a widespread practice or custom of failing to train its officers in the common, routine, and foreseeable tasks that officers had to perform and, specifically, the constitutional limits of permissible stops and seizures, and engagement with individuals suspected of violent crime and property theft, among other things.

159. The City of Memphis had a widespread practice of failing to train its officers on the following:

COMPLAINT
PAGE 28 OF 37

    a.   The constitutional parameters on the use of force;

    b.   The constitutional parameters on the use of deadly force;

    c.   The constitutional parameters on the intervention to prevent the use of unreasonable force;

    d.   The constitutional parameters on the intervention to prevent the use of deadly force;

    e.   The constitutional parameters on conducting *Terry* stops;

    f.   The constitutional parameters on the search and seizure;

    g.   The Fourth Amendment to the United States Constitution; and

    h.   De-escalation with citizens.

160.    The City of Memphis' failure to train in the aforementioned areas was so permanent, well-settled, widespread, and commonly accepted that it constituted an official custom or policy.

161.    The City of Memphis was consciously aware and on notice of this pattern of failures, but continued to let rookie officers operate in the field.

162.    The City of Memphis was deliberately indifferent to the consequence of their failures to train and to civil rights violations that were obvious, predictable, and readily foreseeable as a result.

163.    Alternatively, even without a widespread practice, the City of Memphis failed to equip officers with the training to handle situations that were bound to occur during the course of their specific job responsibilities.

COMPLAINT
PAGE 29 OF 37

164. The need for training officers on the constitutional bounds of their jobs was so obvious that the City of Memphis knew that if training were not provided, then it was highly predictably and likely to result in the violation of citizens' constitutional rights.

165. Had the City of Memphis trained the Memphis Police Department officers in the areas alleged in Paragraph 159, it would have prevented the violation of Mr. McKenzie's constitutional rights.

166. The City of Memphis' failure to train its officers in the areas alleged in Paragraph 159, was the moving force behind:

    a. The unlawful and unconstitutional stop made by Defendant Officers against Mr. McKenzie;

    b. The excessive, unconstitutional, and deadly force used by Defendant Officers against Mr. McKenzie;

    c. The failure of Defendant Officers to intervene in the excessive, unconstitutional, and deadly force used by Defendant Officers against Mr. McKenzie.

    d. The harms inflicted against and injuries suffered by Mr. McKenzie.

    e. The death of Mr. McKenzie; and/or

    f. The constitutional violations alleged in this Complaint.

167. Mr. McKenzie's injuries and death were a highly predictable consequence of the City of Memphis' failure to train officers in the areas alleged in Paragraph 159.

COMPLAINT
PAGE 30 OF 37

168.   Mr. McKenzie's injuries and death were a direct, foreseeable, and proximate result of the City of Memphis' failure to train its officers in the areas alleged in Paragraph 159.

169.   As a direct and proximate result of the City of Memphis' failure to train its officers in the aforementioned areas, Mr. McKenzie suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

170.   As a direct and proximate result of the City of Memphis' failure to train its officers in the aforementioned areas, Mr. McKenzie suffered catastrophic pain, suffering, emotional distress, anguish, personal injuries, and death.

171.   As a direct and proximate result of the acts described in this Count, Mr. McKenzie's next of kin have suffered pecuniary loss, including medical and funeral expenses; loss of future wages and earnings; and loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by the jury.

172.   Plaintiff is entitled to recovery of costs and reasonable attorneys' fees as prescribed under 42 U.S.C. § 1988.

### COUNT 4— 42 U.S.C. § 1983—Fourth Amendment Violation— Excessive Force

*Plaintiff v. Nahum Dorme, in his individual capacity*

173.   Plaintiff hereby incorporates and realleges Paragraphs 1 through 117 as though fully pleaded herein.

174.   As a result of the allegations contained herein, Defendant Nahum Dorme is liable to the Estate of Jaylin Mr. McKenzie for violating Mr. McKenzie's Fourth Amendment rights by

COMPLAINT
PAGE 31 OF 37

subjecting him to excessive, unreasonable, and deadly force and for causing his death on December 16, 2022.

### COUNT 5— 42 U.S.C. § 1983—Fourth Amendment Violation—Unreasonable Stop

*Plaintiff v. Officer Nahum Dorme, in his individual capacity*

175.  Plaintiff hereby incorporates and realleges Paragraphs 1 through 117 as though fully pleaded herein.

176.  As a result of the allegations contained herein, Defendant Christopher Jackson is liable to the Estate of Jaylin Mr. McKenzie for violating Mr. McKenzie's Fourth Amendment rights by subjecting him to excessive, unreasonable, and deadly force and for causing his death on December 16, 2022.

### COUNT 6— 42 U.S.C. § 1983—Fourth Amendment Violation—Unreasonable Stop

*Plaintiff v. Christopher Jackson, in his individual capacity*

177.  Plaintiff hereby incorporates and realleges Paragraphs 1 through 117 as though fully pleaded herein.

178.  As a result of the allegations contained herein, Defendant Christopher Jackson is liable to the Estate of Jaylin Mr. McKenzie for violating Mr. McKenzie's Fourth Amendment rights by subjecting him to excessive, unreasonable, and deadly force and for causing his death on December 16, 2022.

COMPLAINT
PAGE 32 OF 37

## COUNT 7— 42 U.S.C. § 1983—Fourth Amendment Violation—Failure to Intervene to Prevent Excessive Force

*Plaintiff v. Christopher Jackson, in his individual capacity*

179.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 117 as though fully pleaded herein.

180.    As a result of the allegations contained herein, Defendant Christopher Jackson is liable to the Estate of Jaylin Mr. McKenzie for violating Mr. McKenzie's Fourteenth Amendment rights by not intervening in excessive, unreasonable, and deadly force and for causing his death on December 16, 2022.

## COUNT 8— 42 U.S.C. § 1983—Fourth Amendment Violation—Excessive Force

*Plaintiff v. Christopher Jackson, in his individual capacity*

181.    Plaintiff hereby incorporates and realleges Paragraphs 1 through 117 as though fully pleaded herein.

182.    As a result of the allegations contained herein, Defendant Christopher Jackson is liable to the Estate of Jaylin Mr. McKenzie for violating Mr. McKenzie's Fourth Amendment rights by subjecting him to excessive, unreasonable, and deadly force and for causing his death on December 16, 2022.

## COUNT 9— 42 U.S.C. § 1983—Fourteenth Amendment—Failure to Provide Medical Care

COMPLAINT
PAGE 33 OF 37

*Plaintiff v. Nahum Dorme, in his individual capacity*

183.   Plaintiff hereby incorporates and realleges Paragraphs 1 through 117 as though fully pleaded herein.

184.   As a result of the allegations contained herein, the Defendant Nahum Dorme is liable to the Estate of Jaylin Mr. McKenzie for violating Mr. McKenzie's Fourth Amendment rights by failing to provide necessary medical care to him and in their deliberate indifference to his medical needs.

### COUNT 10— 42 U.S.C. § 1983—Fourteenth Amendment—Failure to

### Provide Medical Care

*Plaintiff v. Christopher Jackson, in his individual capacity*

185.   Plaintiff hereby incorporates and realleges Paragraphs 1 through 117 as though fully pleaded herein.

186.   As a result of the allegations contained herein, the Defendant Christopher Jackson is liable to the Estate of Jaylin Mr. McKenzie for violating Mr. McKenzie's Fourth Amendment rights by failing to provide necessary medical care to him and in their deliberate indifference to his medical needs.

### COUNT 11— 42 U.S.C. § 1983—Fourteenth Amendment—Failure to

### Provide Medical Care

*Plaintiff v. Ericsteven Cook, in his individual capacity*

187.   Plaintiff hereby incorporates and realleges Paragraphs 1 through 117 as though fully pleaded herein.

COMPLAINT
PAGE 34 OF 37

188. As a result of the allegations contained herein, the Defendant Cook is liable to the Estate of Jaylin Mr. McKenzie for violating Mr. McKenzie's Fourth Amendment rights by failing to provide necessary medical care to him and in their deliberate indifference to his medical needs.

## COUNT 12— 42 U.S.C. § 1983—Fourteenth Amendment—Violation of

## Deliberate Indifference to Serious Medical Needs

*Plaintiff v. Joseph Mallet, in his individual capacity*

189. Plaintiff hereby incorporates and realleges Paragraphs 1 through 117 as though fully pleaded herein.

190. As a result of the allegations contained herein, the Defendant Mallet is liable to the Estate of Jaylin Mr. McKenzie for violating Mr. McKenzie's Fourth Amendment rights by failing to provide necessary medical care to him and in their deliberate indifference to his medical needs.

## COUNT 13— 42 U.S.C. § 1983—Fourteenth Amendment—Loss of Society

## And Companionship

*Plaintiff v. Nahum Dorme, in his individual capacity*

191. Plaintiff hereby incorporates and realleges Paragraphs 1 through 117 as though fully pleaded herein.

192. As a result of the allegations contained herein, Defendant Nahum Dorme is liable to the Estate of Jaylin Mr. McKenzie for violating Mr. McKenzie's Fourth Amendment

COMPLAINT
PAGE 35 OF 37

rights by failing to provide necessary medical care to him and in their deliberate indifference to his medical needs.

## JURY DEMAND

Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiffs pray that the Court award:

A.    Compensatory and consequential damages to the Estate of Jaylin Mr. McKenzie, in an amount to be proven at trial;

B.    Compensatory damages to Plaintiff Ashley Mr. McKenzie Smith, individually, for the loss of the society and companionship of her son, in an amount to be proven at trial;

C.    Punitive damages, in an amount to be proven at trial;

D.    Reasonable attorneys' fees, costs, and prejudgment interest incurred in pursuing this action as provided for in 42 U.S.C. § 1988; and

E.    Any such other relief that this Court deems just and equitable under the circumstances of this case.

DATED this 13th day of December 2023.

ASHLEY MR. MCKENZIE SMITH    *Ashley M Smith*

*By:    /s/ Ashley Mr. McKenzie Smith*
Ashley Mr. McKenzie Smith
Pro Se for Plaintiffs

COMPLAINT
PAGE 36 OF 37

Ashley McKenzie Smith
268 Lakeview Place
Stockbridge, GA 30281
Email: ashleylmck02@gmail.com
Tel: 404-644-4167

COMPLAINT
PAGE 37 OF 37